**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ANDREW WEAVER, JR.,

                              Plaintiff,

          v.                                  No. 12-CV-684
                                               (TJM/CFH)

MICHAEL J. AMATO, Sheriff; MICHAEL
FRANKO, Jail Administrator;

                            Defendants.

_____

**APPEARANCES:**                         **OF COUNSEL:**

ANDREW WEAVER, JR.
Plaintiff Pro Se
26 Hancock Street
Fort Plain, New York 13339

LAW OFFICE OF THERESA PULEO      MURRY S. BROWER, ESQ.
Attorney for defendants
Post Office Box 12699
Albany, New York 12212

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

    Plaintiff pro se Andrew Weaver ("Weaver"), an inmate recently released from local

custody, brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, the

Montgomery County Sheriff and Jail Administrator, violated his constitutional rights under

the Eighth Amendment.  Compl. (Dkt. No. 1).  Presently pending is defendants' motion for

summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 9.  Weaver has failed to

respond to the motion.  For the following reasons, it is recommended that defendants'

_____

      [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

motion be granted in part and denied in part.

## I.  Failure to Respond

Weaver did not oppose defendants' motion. "[J]udgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996).  Defendants' provided such notice in the notice of motion, stating that Allen "must respond by affidavits or as otherwise provided in the rule, setting forth specific facts showing that there is a genuine issue of material fact for trial."  Dkt. No. 9 at 1.  Moreover, the Court provided notification of the response deadline and the consequences of failing to respond to such a motion.  Dkt. No. 10.  Despite such notice, Weaver failed to respond.  Because Weaver has not responded to raise any question of material fact, to the extent defendants have pled properly supported facts, such facts as set forth by defendants are accepted as true. See Cusamano v. Sobek, 604 F. Supp. 2d 416, 452-453, 453 n.48 (N.D.N.Y. 2009); see also N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.") (emphasis in original).

## II. Background

### A. Involuntary Protective Custody

Weaver was incarcerated at Montgomery County Jail ("Montgomery") from January 3, 2012 through August 28, 2012.  Franko Aff. (Dkt. No. 9-1 at 1-4) ¶ 2.  Weaver "was being

held on exam until convicted on the following charge of Petit Larceny on [June 12, 2012.]"
Franko Aff. ¶ 2; see also Dkt. No. 9-1 at 7 (indicating date of arrest as January 3, 2013 and
date of conviction for Petit Larceny as June 12, 2012).[2]

Upon arrival, all inmates are processed and evaluated for placement in the appropriate
housing unit.  Franko Aff. ¶ 3; Id. ¶ 4 (explaining that classification officers consider an
inmate's "past criminal history . . . and information if that person has been in the jail on
other occasions.").  With respect to Weaver, as with all inmates, his classification was
determined after evaluating the charges pending and the past history of sex-related
offenses[3], all based on the system established by the jail to make the classification as
objective as possible.  See Dkt. No. 9-1 at 35-38, 48-51, 64-67 (inmate classification
sheets).

After spending several days undergoing classification, Weaver was administratively
segregated into Involuntary Protective Custody ("IPC") due to his sex offender status.
Compl. at 7 (contending classification terminated and he was sent to IPC on January 8,
2012); Franko Aff. ¶¶ 8-9; but see Dkt. No. 9-1 at 39 (indicating that Weaver would be
placed in IPC "due to previous convictions, safety, security of oneself & facility," signed and
dated by both a Montgomery Officer and Weaver on January 6, 2012).  As someone with a

---

[2] It is unclear what defendants mean when they saw Weaver was incarcerated "on
exam."  However, it seems reasonable that given he was convicted in June and arrived in
January, Weaver's status was a pretrial detainee for the first five and a half months he
was at Montgomery.

[3] It appears Weaver's sexual offenses occurred in 1997-1999 and, most recently, in
2004.  Dkt. No. 9-1 at 81-82, 85; see also Id. at 80 (indicating that Weaver is "registered
as a convicted sexual offender" as of August 22, 2004); Franko Aff. ¶ 2 (Weaver "was
charged with a sex related crime when brought to the facility on [April 14, 2011].").

prior sex offense, Weaver was considered to be in a group that most likely may be victimized and was segregated from inmates housed in the general population. Franko Aff. ¶¶ 46-9. On January 6, 2012, Weaver signed paperwork indicating that he was being placed in IPC due to these reasons. Dkt. No. 9-1 at 39.

"In the late fall of 2010 and continuing into the winter and spring of 2011[] the inmate population of Montgomery . . . was growing[; thus] the Sheriff and [Administrator] began to discuss how the rising population might impact the safety of inmates and . . . of corrections officers assigned to the various pods . . . . " Franko Aff. ¶ 6. Specifically during this time period, there was "a rise in the population of sex offenders[, which] . . . was a concern given that sex offenders are often victimized in a correction setting when housed in the general population." Franko Aff. ¶ 7. This also caused a concern for the safety of the correctional staff "who intervene to break up fights and provide a higher level of protection to the vulnerable population." Franko Aff. ¶ 7.

While in IPC, it is undisputed that Weaver was locked in his cell for twenty-three hours a day, with one hour of recreation during which he could use the phone or shower. Compl. at 7; see also Franko Aff. ¶ 9 ("While in [IPC, inmates] . . . were allowed out of their cells for one hour each day for recreation, showers, etc."). Weaver never violated any disciplinary rules and was upset with his inability to move about the housing unit, allowance to only have visitation once a day in the early morning, restricted ability to contact his attorney, shower, and have access to various amenities, necessity to choose between those available privileges which were limited and only available for an hour a day, and inability to attend programming and religious services. Compl. at 7-8.

Defendants emphatically state that placement in IPC was not punitive, but prophylactic.

4

Franko Aff. ¶ 12.  Further, defendants assert that IPC inmates were not limited on their

abilities to engage in religious activities as they "were free to request to practice religion and

to have religious based visits from pastors  and the like."  Franko Aff. ¶ 10.  Defendants also

contend that IPC inmates could participate in educational activities, just not with those

inmates in general population, have access to the law library, and participate in visits with

their families.  Franko Aff. ¶¶ 9-11.[4]

While failing to provide a date, Weaver contends that he filed a grievance concerning his

housing, seeking removal from IPC, "and was told that being put into Administrative

Segregation [was] for [his] own personal safety [ans wa]s not a Grievable Issue."  Compl. at

8; see also Franko Aff. ¶ 9 (explaining that inmates with pending or prior sex offenses "were

not given the option to join the general population."); Id. ¶ 13 ("classification and placement

in [IPC] is not grievable . . . and therefore, when Mr. Weaver asked to file a grievance he

probably was told that he could not file a grievance.").  However, Franko explains that

Weaver "could have appealed to [Franko] as the Jail Administrator [regarding] his

classification status . . . ."  Franko Aff. ¶ 13.  Franko further explained that, pursuant to

"Commission of Correction rules . . . classification is to be reviewed every thirty days upon

request by an inmate in special confinement.  Mr Weaver's classification into [IPC] would

have been reviewed in thirty days if requested by him."  Franko Aff. ¶ 14.

Despite Franko's affirmations that Weaver could have, but did not, appeal to him

regarding his classification, Weaver's inmate records indicate that the administrative

---

[4] Franko's Affidavit does not speak to, and the record does not contain
documentation of, the policy surrounding the ability and frequency with which the inmates
were permitted to contact and converse with their attorneys.

segregation notice form which was initially signed upon his placement in IPC in January was modified on March 20, 2012 to discontinue his IPC confinement.  Dkt. No. 9-1 at 39.  The notation indicates that "at the behest of . . . the N[ew ]Y[ork ]S[tate] C[ommission ]O[n ]C[orrections], [Weaver's] classification has been reviewed," and apparently changed.  Id.  An inmate classification form, which appears to have been filled out concurrently[5], awards Weaver points for (1) a present, non-violent felony, sex offense misdemeanor, or federal charge; (2) a past non-violent felony or sex offense misdemeanor; and (3) a history of institutional misconduct.  Dkt. No. 9-1 35-37.  A notation indicates that Weaver was "[r]emoved from [I]PC status."  Dkt. No. 9-1 at 37.

## B. Prior Incarcerations and Classifications

On August 16, 2011, Weaver was previously incarcerated at Montgomery.  Dkt. No. 9-1 at 62-67.  During that time, Weaver underwent classification and it was determined that he was to be "confined to [IPC] . . . for his own personal safety and for the safety and security of the facility."  Id. at 62.  Specifically, Weaver's classification form indicated points being awarded for prior criminal conduct (thirty-five points) and previous institutional misconduct (fifty-five points).  Id. at 64-65.  Additionally, the form concluded that because Weaver was "[g]uilty of assault [and] fighting in the past in [Montgomery he was] classified I[PC] for his own safety."  Id. 66.

On November 15, 2011, Weaver was again incarcerated and classified at Montgomery.

––––––––––––––––––––

[5] While the date on the inmate classification form is March 20, 2010, it appears that this was a mistake as the rest of the form indicates that Weaver will be removed from ICP. Dkt. No. 9-1 at 35-37.

Dkt. No. 9-1 at 46-50.  Paperwork signed on the same date indicates that Weaver was, for safety and security purposes, confined to IPC because he was "[g]uilty of assault and fighting in the pris[on]."  Id. at 50.  Specifically, Weaver's classification form indicated increased point values for his past crimes (thirty-five points) in addition to his previous institutional misconduct and assault on correctional staff or inmates (fifty-five points).  Id. at 48-49.  Consideration was also given to the fact that Weaver represented a "[k]nown management problem."  Id. at 50.

### III.  Discussion

In his complaint, Weaver alleges that his Eighth Amendment rights were violated by defendants' discriminatory practice of housing inmates with a present or prior sex offenses in IPC.  While stated as an Eighth Amendment claim, such contentions are best analyzed pursuant to an Equal Protection analysis.  Furthermore, liberally construing Weaver's complaint, he has alleged a violation of his Fourteenth Amendment regarding (1) his conditions of confinement and (2) due process procedures for both his initial and continued IPC confinement.  Lastly, liberally construing Weaver's allegations, he also proffered claims regarding his access to counsel and religious services.  Defendants seek dismissal contending that  Weaver's conditions of confinement, access to religious services, and Equal Protection claims are meritless.

### A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any

material fact if supported by affidavits or other suitable evidence and the moving party is

entitled to judgment as a matter of law.  The moving party has the burden to show the

absence of disputed material facts by informing the court of portions of pleadings,

depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the

case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the

non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue

for trial.  The non-moving party must do more than merely show that there is some doubt or

speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could

find in favor of the non-moving party for a court to grant a motion for summary judgment.

Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v.

Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," . . . that a pro se litigant's
> submissions must be construed "liberally,". . . and that such
> submissions must be read to raise the strongest arguments that
> they "suggest," . . . .  At the same time, our cases have also
> indicated that we cannot read into pro se submissions claims
> that are not "consistent" with the pro se litigant's allegations, . . .
> or arguments that the submissions themselves do not "suggest,"
> . . . that we should not "excuse frivolous or vexatious filings by

> pro se litigants," . . . and that pro se status "does not exempt a
> party from compliance with relevant rules of procedural and
> substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537

F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded

district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his

pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion;

the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at

247–48.


## B. Religious Services

The First Amendment protects the right to free exercise of religion.  See generally Cutter

v. Wilkinson, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain

some measure of the constitutional protection afforded by the First Amendment's Free

Exercise Clause."  Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v.

Procunier, 417 U.S. 817, 822 (1974)); see also Nolley v. County of Erie, No. 07-CV-488S,

2008 WL 859165 (W.D.N.Y. Mar. 31, 2008) (applying First Amendment freedom of religion

protections to a pretrial detainee)[6].

> To assess a free exercise claim, a court must determine (1)
> whether the practice asserted is religious in the person's scheme of
> beliefs, and whether the belief is sincerely held; (2) whether the
> challenged practice of the prison officials infringes upon the
> religious belief; and (3) whether the challenged practice of the
> prison officials furthers some legitimate penological objective.

---

[6] Unpublished cases will be attached to the Report-Recommendation and Order.

9

<u>Farid v. Smith</u>, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted).  This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security."  <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987) (citations omitted); <u>see</u> <u>also</u> <u>Benjamin v. Coughlin</u>, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

> The <u>Turner</u> Court determined that the four factors to be considered are: 1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

<u>Benjamin</u>, 905 F.2d at 574 (citing <u>Turner v. Safely</u>, 483 U.S. 78, 89-91 (1987).

""[P]risoners have a constitutional right to participate in congregate religious services." <u>Salahuddin v. Coughlin</u>, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted).  "Confinement in keeplock does not deprive prisoners of this right."  <u>Id.</u> (citations omitted).  While the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, . . . prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible."  <u>Young v. Coughlin</u>, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted).   "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." <u>Benjamin v. Coughlin</u>, 905 F.2d 571, 574 (2d Cir. 1990) (citations omitted).  The same analysis is undertaken when there is an allegation that "an individual dec[ided] to

10

deny a prisoner the ability to engage in some requested religious practice."  Ford, 352 F.3d at 595 n.15 (citations omitted).

In this case, even liberally construing Weaver's claim, he has failed to state a First Amendment claim.  Weaver's complaint fails to establish the first element in the analysis as Weaver's complaint and motion papers remain silent with respect to what religion Weaver was a member of and, by extension, what sincerely held religious practices were withheld from him during his IPC confinement.  Weaver's general and conclusory claims that all IPC inmates were precluded from practicing religion are insufficient to raise a question of material fact.  Without establishing a firmly held religious belief or identifying any interference with those practices, the discussion cannot further progress to an evaluation of whether isolating IPC residents from general population religious services was reasonable.  See e.g., Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006) (articulating test that inmates "must show at the threshold that the disputed conduct . . . burdens his sincerely held religious beliefs," prior to advancing to the Turner test and "legitimate penological interests that justify the impinging conduct . . . .") (citations omitted).  Accordingly, defendants' motion on this ground should be granted.

### C. Access to Counsel

"[T]he right to counsel and the right to access to the court are interrelated . . . [h]owever, the two rights are not the same."  Benjamin v. Fraser, 264 F.3d 175, 186 (2d Cir. 2001). "[A]ccess claims . . . concern[] the ability of . . . prisoners to attack their sentences, directly or collaterally, and to challenge the conditions of their confinement.  By contrast . . . the Sixth Amendment [confers the] right of a pretrial detainee, in a case brought against him by

11

the state, to utilize counsel in his defense." Id. (internal quotation marks, alterations, and citations omitted).

## 1. Sixth Amendment

"[P]retrial detainees need access to the courts and counsel . . . to defend against the charges brought against them." Benjamin v. Fraser, 264 F.3d 175, 186 (2d Cir. 2001) (citations omitted). Accordingly, the Second Circuit has determined that a pretrial detainee's Sixth Amendment rights are infringed upon when prison regulations "unjustifiably obstruct", "infringe", "unreasonably burden", or "significantly interfered" with the detainee's access to counsel. Id. at 187 (quoting Procunier v. Martinez, 416 U.S. 396, 419 (1989); Bell v. Wolfish, 441 U.S. 520, 547 (1979); Wolfish v. Levi, 573 F.2d 118, 133 (2d Cir. 1978); Cobb v. Aytch, 643 F.3d 946, 957 (3rd Cir. 1981) respectively).

In this case, Weaver contends that his IPC lock-up did "not allow [him the] right to contact [his] lawyer when needed." Compl. at 7. The undersigned liberally construed Weaver's complaint to state a claim as Weaver's conclusory allegations fail to indicate what counsel he was denied access to and for what purpose the counsel was involved, when Weaver's requests to meet with counsel were made and how they were handled, or how the defendants' obstructed, interfered, unreasonably burdened or infringed upon his Sixth Amendment rights to participate in his criminal defense. It is assumed that Weaver refers to whatever counsel was involved in his criminal case, given that from January through March when he was in IPC he was a pretrial detainee with criminal charges pending. However, for the reasons stated above, upon the present record such conclusory claims are

insufficient to establish a Sixth Amendment violation.


## 2. First Amendment and Due Process

Pretrial detainees also have a constitutional right for meaningful access to the courts, which may be satisfied pursuant to the appointment of counsel. Bourden v. Loughren, 386 F.3d 88, 93 (2d Cir. 2004) (citing cases). Such a right "requires that prisoners defending against criminal charges or convictions (either directly or collaterally) or challenging the conditions of their confinement . . . not be impeded from presenting those defenses and claims for formal adjudication by a court." Id. at 96 (citing inter alia Bounds v. Smith, 430 U.S. 817, 823 (1977)). Thus,

> when a prisoner with appointed counsel claims that he was hindered by prison officials in his efforts to defend himself or pursue other relevant legal claims, he must show that, on the facts of his case, the provision of counsel did not furnish him with the capability of bringing his challenges before the courts, not that he was denied effective representation in the court.

Id. at 98 (citations omitted).

Construing Weaver's claims liberally, there is also the potential that he is contending that defendants denied him meaningful access to the courts. Weaver attempts to allege that defendants restricted Weaver's access to the point where it was an impediment. However, for substantially the same reasons as stated above, Weaver's complaint fails to indicate what he was hindered from completing. Weaver does not make any contentions about his ability to present his defense or how his criminal action proceeded, or failed to proceed, while incarcerated at Montgomery. Nor does Weaver allege that his counsel was incapable of presenting his various defense arguments, which Weaver also failed to

13

identify, before the court.  Thus, even viewing the facts in the light most favorable to Weaver, he has failed to proffer facts sufficient to support any potential access to the court claim.

### D. Conditions of Confinement[7]

Weaver also contends that he was subjected to unconstitutional conditions of confinement since he was locked in his cell for twenty-three hours a day and was only allowed out of his cell for one hour a day to shower, engage in recreation, visit with his family, speak with fellow inmates, use the telephone, program, and watch television.

Claims concerning the conditions of confinement brought by a pretrial detainee, such as Weaver, must be analyzed under the Fourteenth Amendment's Due Process Clause.  The Due Process Clause provides that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  Bell v. Wolfish, 441 U.S. 520, 535-36 (1979) (citations omitted).  However, the standards when evaluating deliberate indifference to a person in custody are identical whether under the Eighth or Fourteenth Amendment. Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir.2009) ("Claims should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); see also Shane v. Winnebego County Dep't of Soc. Servs., 489 U.S. 189, 199–200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some

---

[7] While defendants analyze Weaver's conditions of confinement claim pursuant to the Eighth and not Fourteenth Amendment, for the reasons stated infra, this is inconsequential as pretrial detainees conditions of confinement claims are evaluated by Eighth Amendment case law and analysis.

responsibility for his safety and general well-being . . . [including] food, clothing, shelter, medical care, and reasonable safety . . . .") (citations omitted). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment. Therefore, Allen's conditions of confinement claim will be considered under Eighth Amendment standards.

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1884). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test." <u>Jolly v. Coughlin</u>, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element – that the prison officials' transgression was sufficiently serious– and a subjective element – that the officials acted, or omitted to act, with a sufficiently culpable state of mind . . . ." <u>Phelps v. Kapnolas</u>, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone . . . [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.

<u>Davidson v. Murray</u>, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

unusual punishment when no specific deprivation of a single human need exists." Id. (citing Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate health or safety" Farmer, 511 U.S. at 834 (citations omitted).

In this case, Weaver's claims that he was confined in administrative segregation for twenty-three hours a day, only allowed to shower, visit his family, use the phone, and interact with other inmates during his one hour long recreation, prohibited from wandering around outside of his cell, limited in his ability to watch television, and being forced to pick and choose which amenities he wanted to avail himself to given his limited amount of time outside of his cell, are insufficient to support an Eighth Amendment claim.  Generally, administrative segregation conditions, even though "restrictive and . . . harsh, [are insufficient to establish Eighth Amendment violations because] they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Weaver has failed to allege any deprivations of a single, identifiable human need.  See Greene v. Furman, 610 F. Supp. 2d 234, 237 (W.D.N.Y. 2009) (holding that inmate's Eighth Amendment claim originating from his confinement in segregation was insufficient to state a constitutional claim as the allegations of denied exercise, showers and haircuts, did not represent atypical treatment, result in physical injury, or establish cruel and unusual punishment).  Moreover, to the extent Weaver contends that his inability to program was an Eighth Amendment violation, such contentions are meritless.  See Griffin v. Coughlin, 743 F. Supp. 1006, 1017 (N.D.N.Y. 1990) ("[Inmates] have no eighth amendment right to prison work and educational activities.") (citations omitted).  Weaver was given warmth, shelter, clothing, food, and exercise.  Weaver was allowed to shower and have

16

morning visitations throughout the week.  Weaver was just upset that he did not have more freedom with his time and movement.  However, such claims are insufficient to establish the objective prong of the analysis.

Accordingly, defendants' motion on this ground should be granted.


## E. Fourteenth Amendment

### 1. Due Process[8]

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. Amend. XIV § 1.  It is important to emphasize that due process "does not protect against all deprivations of liberty.  It protects only against deprivations of liberty accomplished without due process of the law."  Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted).  "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies."  Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).

As a pretrial detainee, Weaver's "liberty interest in freedom from restraint is highly qualified and must be balanced against the state's reasons for restraining that liberty[; thus,] restrictions on pretrial detainees . . . may not amount to punishment . . . ."  Benjamin v. Fraser, 264 F.3d 175, 188 (2d Cir. 2001) (citations and internal quotation marks omitted).  Unlike convicted prisoners, who must satisfy the standard of "atypical and significant hardship" outlined in Sandin v. Conner, 515 U.S. 472 (1995), a pretrial detainee need not

---

[8] Defendants' memorandum of law did not address any due process issues.

17

meet such a stringent standard because "[a] detainee's interest in freedom from unjustified infliction of pain and injury is more substantial . . . ." Id. at 188-90; see also Iqbal v. Hasty, 490 F.3d 143, 146 (2d Cir. 2007) rev on other grounds Ashcroft v. Iqbal, 556 U.S. 662 (2009) ("Th[e Second Circuit] has said that Sandin does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.").

### a. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). "Aside from any state policy or regulation, the force of the Due Process Clause itself protects pre-trial detainees from restrictive confinement." Shine v. Hofmnn, No. 06-CV-237, 2009 WL 2179969, at *5 (D. Vt. July 22, 2009) (citing Kentucky Dep't of Corr., 490 U.S. at 459-60).[9]

As previously discussed, the Second Circuit has determined that pretrial detainees may not be subjecting to punishment prior to an adjudication of guilt. Benjamin, 264 F.3d at 188

---

[9] All unreported decisions are attached as exhibits to this Report-Recommendation.

(citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979)). In determining whether a restriction is

punitive, a court may consider

> Whether the sanction involves an affirmative disability or restraint,
> whether it has historically been regarded as punishment, whether it
> comes into play only on a finding of <u>scienter</u>, whether its operation
> will promote the traditional aims of punishment – retribution and
> deterrence, whether the behavior to which it applies is already a
> crime, whether an alternative purpose to which it may rationally be
> connected is assignable . . . and whether it appears excessive in
> relation to the alternative purpose assigned . . . .

<u>Bell</u>, 441 U.S. at 537-38 (quoting <u>Kennedy v. Mendoza-Martinez</u>, 372 U.S. 144, 168-69

(1963)).

> Absent a showing of an expressed intent to punish, the
> determination whether a condition is imposed for a legitimate
> purpose or for the purpose of punishment generally will turn on
> whether an alternative purpose to which the restriction may
> rationally be connected is assignable for it, and whether it appears
> excessive in relation to the alternative purpose assigned to it.
> Thus, if a particular condition or restriction of pretrial detention is
> reasonably related to legitimate governmental objective, it does not,
> without more, amount to punishment. Conversely, if a restriction or
> condition is not reasonably related to a legitimate goal – if it is
> arbitrary or purposeless – a court permissibly may infer that the
> purpose of the governmental action is punishment that may not
> constitutionally be inflicted upon detainees . . . .

<u>Id.</u> at 538-39 (internal quotation marks and alterations and citations omitted); <u>see</u> <u>also</u>

<u>Benjamin</u>, 264 F.3d at 188 (same).


### i. Initial Placement in IPC

New York regulations require "chief administrative officer[s] of each [local or county]

correction facility [to] establish, implement, and maintain a formal and objective system for

the consistent classification of all inmates." N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013.1.

These detailed regulations provide (1) various classification categories (Id. § 7013.4); (2) provisions for a screening instrument which records information regarding the inmate's physical and mental health, criminal history, incarceration history, and any other relevant information (Id. § 7013.7); (3) requirements that classification be generally determined within five business days of admission into the facility (Id. § 7013.8); and (4) conditions under which an inmate's classification should be changed (Id. § 7013.9). While no jail policy was provided outlining the intake and classification procedures, defendant Franko affirmed, and the jail intake forms corroborated, that the same categories were used when classifying inmates as those articulated in the New York regulations. Most specific to this case was Weaver's present and past criminal charges.

It is undisputed that Weaver arrived at Montgomery on January 3, 2012. While Weaver contends, without any corroboration, that he spent seven days in classification documents indicate that Weaver spent less than five days segregated for classification purposes. Compare Compl. at 7 (stating that Weaver "stayed in classification for (7) days.") with Dkt. No. 9-1 at 39 (indicating that Weaver would be placed in IPC "due to previous convictions, safety, security of oneself & facility," signed and dated by both a Montgomery Officer and Weaver on January 6, 2012). Moreover, "[t]he [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir. 1995) (internal quotation marks and citations omitted). The balancing test articulated in Turner v. Safely has been deemed uniquely instructive in considering whether "a prison regulation infringing on an inmate's constitutional rights is valid[,] so long as the regulation is reasonably related to the

legitimate penological interests." Harvey v. Harder, No. 09-CV-154 (TJM/ATB), 2012 WL 4093791, at *7 (citing Turner, 482 U.S. at 89).

> The Turner Court determined that the four factors to be considered
> are: 1) whether there is a rational relationship between the
> regulation and the legitimate government interests asserted; 2)
> whether the inmates have alternative means to exercise the right;
> 3) the impact that accommodation of the right will have on the
> prison system; and 4) whether ready alternatives exist which
> accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

A recent case in the Northern District of New York has already deemed the initial, temporary segregation of an inmate in a county jail during classification procedures valid and not an infringement upon due process protections. Harvey, 2012 WL 4093791, at *7. In that case, the county jail had identical initial classification policies also based on the New York regulations.

> Until an inmate is screened for prior violence; propensity for
> victimization; possible enemies; behavior; and adjustment, the
> facility administrators have no way of knowing where the best place
> to house the inmate will be. Thus, a short classification period in
> administrative segregation in order to complete this objective is a
> completely reasonable restriction on an inmate's liberty.

Harvey, 2012 WL 4093791, at *7. For substantially similar reasons, even given Weaver's pretrial detainee status, to the extent that Weaver challenges the initial five day classification period spent in segregation such contentions are insufficient to establish a due process violation. Defendants' actions in confining Weaver in segregation for the limited purposes of classifying him was related to a legitimate penological purpose to which there are no ready alternatives and for which the segregation was neither punitive nor excessive. Accordingly, for these reasons to the extent Weaver has attempted to plead a

due process claim, such contentions are insufficient to support a constitutional violation.


### ii. Continued Placement in IPC

As a pretrial detainee, the Due Process Clause provides a liberty interest in remaining free from restrictive confinement. Moreover, as articulated above, confinement which is deemed punitive pursuant to the above stated factors indicates a liberty interest requiring procedural due process protections. Defendants continually contend that Weaver's confinement was administrative and prophylactic, not disciplinary. See e.g. Colon v. Goord, No. 05-CV-129 (TJM/GJD), 2008 WL 783364, at *7 (N.D.N.Y. Mar. 20, 2008) (explaining that in the NYS Department of Corrections and Community Supervision ("DOCCS") facilities, which fall under different regulations but have analogous housing classifications, "IPC is *not* a disciplinary unit . . . .") (emphasis in original).

However, the undisputed housing conditions for Weaver in IPC, particularly being locked in one's cell for twenty-three hours a day, were more analogous to disciplinary confinement than segregation. See e.g. Id. (explaining that in the DOCCS facilities "IPC inmates are afforded more privileges and have less restrictions than Ad[ministrative] Seg[regation] inmates . . . [who] are subject to the same restrictions as disciplinary S[pecial ]H[ousing ]U[nit] inmates . . . ."). Accordingly, Weaver's restraint to IPC was comparable to confinement which has historically, and is still presently, regarded as punishment. This was further acknowledged by the notation on Weaver's IPC Notice Form where administration indicated that pursuant to COC direction, IPC classifications needed to be reviewed. Dkt. No. 9-1 at 39; see also Id. ("A review of [DOCCS] rules shows that many of the privileges accorded to general population inmates are also accorded to IPC inmates, albeit in a

separate part of the facility."); cf. Torres v. Stewart, 263 F. Supp. 2d 463, 470 (D.Conn. 2003) (discussing the correctness of summary judgment against a pretrial detainee due process case alleging incorrect assignment to maximum security where the plaintiff failed to present evidence that a "decision constituted impermissible punishment."). Accordingly, the fact that Weaver spent approximately three months as a pretrial detainee in an environment generally reserved for those guilty of disciplinary infractions and subject to punitive confinement, is sufficient to satisfy a liberty interest raising due process concerns.

Pursuant to Bell, in the face of behavior that may be deemed punitive, such restrictions will not be held as such if there is a legitimate governmental purpose proffered. Defendants have failed to proffer a penological justification for classifying federal pretrial detainees with prior or pending sex crimes in IPC. See Shine v. Hofmnn, No. 06-CV-237, 2009 WL 2179969, at *5 (D. Vt. July 22, 2009) (holding that where (1) a pretrial detainee was placed in "close custody" with only two hours of recreation a day because he (i) had a disciplinary rules violation with the last year and (ii) was a detainee and (2) defendants failed to offer a legitimate penological justification for the custody determination, such confinement was deemed punitive). Defendants repeatedly state that housing inmates with a criminal history of sex crimes or with a sex offender status was not punitive, but rather prophylactic, as these inmates represented a risk to safety and security of the facility. Defendants have proffered an affidavit from Franko which indicates that inmates with sex offender status were generally more vulnerable and susceptible to victimization, the population of the jail was increasing without a concomitant increase in the number of corrections officers, and that increase was attributed primarily to larger numbers of sex offenders entering custody. Other districts have deemed an inmate's sex offender status to represent a safety issue

23

requiring protective custody. See e.g. Tucker v. Royce, Nos. 09CV35-MPM-JAD, 09CV106-MPM-JAD, 10CV4-MPM-JAD, 2011 WL 541116, at *6 (N.D.Miss. Feb. 8, 2011) (denying Eighth Amendment claims regarding IPC classification because the inmate "was placed in [IPC] for a reason: as a sex offender, he was vulnerable to assault from other inmates . . . ."). Moreover, the Second Circuit has discussed, though not explicitly commented on the constitutionality of the policy of offering IPC to inmates with sex offender histories. See Arnold v. County of Nassau, 252 F.3d 599, 601 (2d Cir. 2001) (explaining in an action alleging failure to protect, and not a due process violation, that the inmate was initially placed into IPC "pursuant to 'Warden's Order: Sex Crimes,' an order designed to assure that inmates charged with sex crimes are removed from the general prison population because they are a greater risk of assault by other inmates.").

However, the present record proffers nothing more than conclusory assertions about the circumstances faced by defendants at Montgomery. Defendants have failed to provide any documentation regarding information including specific numbers of the inmate population and the percentage of sex offenders previously housed at Montgomery, that population's anticipated increase in comparison to the rest of the incoming inmate population, or the number of attacks on sex offenders or those with a sexually based criminal history. See Smart, 441 F. Supp. 2d at 645 (denying qualified immunity because defendants failed to demonstrate anything more than "conclusory statements" about safety concerns essentially providing the court with "no showing that there was any reason to fear for [the inmate's] personal safety."). Moreover, it stands to reason that with multiple housing pods and an increased number of inmates with sex offenses, an alternative existed for housing all sex offenders together in a housing unit, as opposed to IPC and lock-down in individual

24

cells, providing them with freedoms identical to those in general population while still segregating and protecting them from the allegedly dangerous general population inmates.

As a liberty interest has been established, the next question is whether Weaver was provided with appropriate procedural protections. As a form of administrative segregation, as opposed to disciplinary confinement, placement in IPC "requires only an informal, nonadversary review." <u>Smart v. Goord</u>, 441 F. Supp. 2d 631, 641 (S.D.N.Y. 2006). The procedural due process protections are minimal, dictating that the informal review must occur within a reasonable time, after the inmate has had some notice of the charges lodged against him and an opportunity to present his views to the administrator making the determination about segregation. <u>See</u> <u>e.g.</u> <u>McClary v. Kelly</u>, 4 F. Supp. 2d 195, 212 (W.D.N.Y. 1998) (citing <u>Hewitt . Helms</u>, 459 U.S. 460, 460, 476 (1983)). Moreover, the "prison officials must engage in periodic review of the decision . . . to ascertain whether a prisoner remains a security risk . . . [which is] supported by some evidence." <u>Id.</u> at 212-13 (internal quotation marks and citations omitted). Lastly, "administrative segregation may not be used as a pretext for indefinite confinement[, so] . . . periodic reviews [cannot be] a sham; the reviews must be meaningful and not simply perfunctory." <u>Id.</u> at 213 (citations omitted); <u>see</u> <u>also</u> <u>Covino v. Vermont Dep't of Corr.</u>, 933 F.2d 128, 130 (2d Cir. 1991) (explaining that "[a]t some point, however, the administrative necessity for involuntary lock-up begins to pale . . . [and] smacks of punishment.").

However, when considering the restraint of a pretrial detainee, if "a purportedly administrative restraint . . . is found to be tantamount to punishment," the due process standard governed by "<u>Wolff v. McDonnell</u>, which requires written notice of the charges at least twenty-four hour before any hearing, a written statement of factual allegations against

25

the inmate, and at least a limited ability to present witnesses and evidence," applies.  Taylor
v. Santana, No. 05-CV-1860(AKH), 2007 WL 737485, at *4 (S.D.N.Y. Mar. 6, 2007) (citing
Benjamin, 264 F.3d at 190).  While defendants contend that Weaver's IPC placement was
prophylactic and not punitive, for the reasons outlined above, such contentions have been
deemed insincere and Weaver's restraint has been found excessive given the
circumstances.  Cf. Taylor, 2007 WL 737485, at *5 (citations omitted) (deeming defendants'
actions in sending a pretrial detainee, found guilty of assault for his involvement in an
altercation which resulted in the death of another inmate, to solitary confinement during
which plaintiff alleged he did not receive notification of the reasons for confinement for
approximately one month, as a non-punitive restriction subject to the informal, due process
standards given defendants legitimate penological purpose in placing a detainee with
"uncontrolled rage and fighting prowess that could be imminently dangers to himself and to
others . . . ." in confinement for the protection of the plaintiff and the rest of the prison
population).

    Initially, Weaver received a document that indicated that because of his criminal history,
he was to be placed in IPC.  Weaver signed the form which served as notification of the
administrative segregation as well as the initial opportunity for Weaver to express his
displeasure with his classification.  Both appear to comply with the minimal procedures
guaranteed by the Due Process clause for administrative, non-punitive confinement.
However, further procedures providing Weaver with a formal opportunity to present
witnesses and evidence at a hearing prior to his IPC confinement were not provided.

    To the extent that procedures were inacted by the facility, it is unclear whether such
procedures comport with the Wolff standard or even were followed by defendants.  Franko's

26

affidavit indicates that classification status was to be reviewed every thirty days pursuant to inmate requests. Franko Aff. ¶ 14. While Franko contends that Weaver never requested review, Weaver alleges that he was expressing his discontent through grievances. Compare Compl. at 7-8 with Franko Aff. ¶ 14. Even if grievances were not the appropriate vehicle with which to challenge his confinement, a question of fact remains regarding whether Franko had notice of Weaver's discontent and whether defendants reviewed Weaver's confinement in compliance with their own policies. Thus, to the extent that defendants may rely on the Turner analysis above to relieve them of responsibility in the face of a potential constitutional infringement, such reliance would be misplaced. It does not appear that defendants followed their own regulations with respect to periodic reviews of the inmates; thus, the Turner analysis is inappropriate. See Nolley v. County of Erie, 776 F. Supp. 715, 739 (W.D.N.Y. 1991) (explaining that the Turner analysis is applicable where it is argued that "an otherwise valid regulation impinges on a plaintiff's constitutional rights, but [not] where the defendants fail[] to follow even their own regulations.").

   Accordingly, as defendants have failed to provide sufficient evidence to establish that neither their intent nor Weaver's restrictions were punitive or that such restrictions were pursuant to a legitimate governmental purpose and, in view of Weaver's pretrial detainee status and viewing the facts in the light most favorable to Weaver, his IPC confinement was punitive and he was entitled to enhanced due process protections. While the lesser due process protections appear to have been met, the record fails to reflect the same of the greater due process protection afforded to those under punitive confinement. Therefore, to the extent Weaver has pled substantive due process claims surrounding the punitive character of his confinement and related procedural due process claims regarding his

continued placement in IPC, such claims remain.

### b. Substantive Due Process

Liberally reading Weaver's complaint, it appears he has also alleged a per se

substantive due process claim concerning his placement and continued confinement in IPC

based on his criminal history and pending charges. "Substantive due process protects

individuals against government action that is arbitrary, conscience-shocking, or oppressive

in a constitutional sense . . . but not against government action that is 'incorrect or ill-

advised'" Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir.1994) (internal citations omitted).

"To establish a violation of substantive due process rights, a plaintiff must demonstrate that

the state action was 'so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience.'" Okin v. Villiage of Cornwall-On-Hudson Police Dep't, 577 F.3d

415, 431 (2d Cir. 2009) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8

(1998)). As already observed by the Northern District of New York, "[v]ery few conditions of

prison life are 'shocking' enough to violate a prisoner's right to substantive due process. In

Sandin v. Conner, the Supreme Court provided only two examples: the transfer to a mental

hospital and the involuntary administration of psychotropic drugs." Samms v. Fischer, No.

10-CV-349 (GTS/GHL), 2011 WL 3876528, at *12 (N.D.N.Y. Mar. 25, 2011) (citations

omitted).

In this case, while the actions of defendants in articulating a policy which summarily

housed a population of inmates in IPC pursuant to potentially legitimate concerns related to

inmate facility and security could be categorized as incorrect or ill-advised, it does not

appear that such a policy was arbitrary, conscience shocking, or constitutionally oppressive.

28

Moreover, given the limited number of recognized circumstances where substantive due process is advanced, and the dissimilarity between those instances and the present claim, to the extent that Weaver is attempting to advance such due process arguments, they are insufficient to establish a constitutional claim.

## 2. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."). "[A]bsent classification by race, alienage or national origin, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Vargas v. Pataki, 899 F. Supp. 96, 98 (N.D.N.Y. 1995) (citations, quotation marks, and internal alterations omitted). Accordingly, strict scrutiny shall only be employed "where the classification involves a fundamental right or a suspect class." Id. (citations and quotation marks omitted).

If an inmate is unable to establish membership in a protected class, "the Supreme Court has recognized 'class of one' claims, where the plaintiff must prove that he was intentionally treated differently from others similarly situated without a rational basis for the difference in treatment." Fortunatus v. Clinton County, N.Y., No. 12-CV-458 (RFT), 2013 WL 1386641, at *11 (N.D.N.Y. Apr. 4, 2013) (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564

29

(2000)).  Such plaintiffs

> must show an extremely high degree of similarity between
> themselves and the persons to whom they compare themselves . .
> . [and] must establish that (1) no rational person could regard the
> circumstances of the plaintiff to differ from those of a comparator to
> a degree that would justify the differential treatment on the basis of
> a legitimate government policy; and (ii) the similarity in
> circumstances and difference in treatment are sufficient to exclude
> the possibility that the defendants acted on the basis of a mistake.

Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) (citations omitted).  "Generally,

whether parties are similarly situated is a fact-intensive inquiry," best suited for the jury,

unless "no reasonable juror could find that the persons to whom plaintiff compares itself are

similarly situated," and then summary judgment is appropriate.  Id. (citations omitted).

Prisoners are not a part of a suspect class.  Scott v. Denison, 739 F. Supp. 2d 342, 362

(W.D.N.Y. 2010) (citations omitted); Lee v. Governor of State of New York, 87 F.3d 55, 60

(2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect

class . . . .").  "[S]ex offenders [also] do not compromise a suspect or quasi-suspect class . .

. [thus any] allegedly different treatment is subject to rational basis scrutiny, that is, it must

be rationally related to a legitimate state interest."  Taylor v. New York State Dep't of Corr.

Servs., No. 07-CV-1288 (NAM/RFT), 2009 WL 3522781, at *2 (N.D.N.Y. Oct. 29, 2009)

(citations omitted).

In this case, a question of fact remains as to Weaver's Equal Protection claim.  Both

sides agree that Montgomery's policy was to summarily classify and house all inmates with

past or present sex offenses in IPC for their own safety.  Therefore, inmates with prior or

alleged sex offenses were treated differently from all other inmates who were generally

housed in, and accorded the amenities of, general population.  Weaver has successfully

30

established a high degree of similarity between himself and the other sex offenders and such similarity and difference in treatment are undisputable so that mistake is not a reasonable possibility.

As previously discussed, defendants have proffered affidavits indicating that their policy of confining sex offenders and those with sexual offenses in their criminal history to IPC was based on a legitimate concern for safety in the prison given the increasing number of inmates and stagnant number of staff.  Furthermore, for the reasons articulated above, there are questions of fact which surround the legitimacy of Montgomery's policy given the lack of factual and statistical evidence.  Conversely, if defendants' claims are proven to be more than conclusory, a rational basis may be deemed to exist.  Accordingly, defendants' motion should be denied on this ground.

## IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 9) be:

1. **GRANTED** as to Weaver's conditions of confinement and religious freedom claims; and

2. **DENIED** in all other respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: May 31, 2013
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge